Good morning. My name is Erindita Castillo. I am assistant federal defender in Tucson, Arizona. Good morning, counsel. I'd like to reserve two minutes for rebuttal, please. You need to watch your own time. You understand that. I shall. Thank you. In this case, a sentence of three years' imprisonment was an abuse of discretion. This child, who was before the court for disposition, this was her first offense. This was the first time that she had been before any court, let alone a district court. This is a child who had had a mental illness which had been undiagnosed. She had, by the time of the disposition, been assessed as having a passive-dependent personality. She was a follower, not a leader. This is a child who, during the course of the time that she was in custody, had made significant progress. She had, in fact, been in family therapy with her family. The family had been trying to get beyond the past. Unfortunately, as a younger child, this young girl had a history of substance abuse. Furthermore, she had had a history of sexual abuse. She, in addition to all those problems, had also had a family that was ravaged by alcoholism. And all these facts were before the court at the time of disposition. However, the court failed to grasp the recommendation of the expert that testified at the disposition I'm sorry, at a mitigation hearing that we had in March of 2004. Dr. Karp testified that this child needed approximately at least 30 to 60 days of in-house residential treatment for controlled substances. This is a child who had never had any kind of treatment for substance abuse and needed it. This is a child, Dr. Karp said, that needed to be under the guidance of the court. This is a child that needed approximately six months in a halfway house after that. And Dr. Karp said that to the court. And regardless of those recommendations, the district court sent this child away to a facility that she knew was going to be far away from her family. Dr. Karp also testified that this child needed to have her sense of self bolstered. She needed to be within her community and within her family in order to do that. Because of the BOP regulation in this case, this child was going to be sent away to Santa Fe. There were no contracting facilities in this case. What? Were you the counsel below? Yes, I was. And you came in with a set of very specific recommendations of facilities in Arizona which had been specifically apprised about this child and said that they could handle her. That's correct. And some of the one thing that was confusing me was I thought that one of the the district court did at least give a set of very specific reasons as to why she was coming to her conclusion. And ultimately, a burden is an abuse of discretion burden, which is a large burden. But one thing I did wonder about is whether she was clear about the security situation with regard to the suggestions that you were making. It appeared to me that she thought that those were not secure facilities, and I'm not sure that's true. Thank you, Your Honor. The court is correct. In fact, we had a predisposition report done in this case, and as a result of that predisposition report, I'm sorry, the preadmission disposition report, and we were very aware that BOP's regulations prior even to the admission of this child were going to limit the court's choices. Therefore, by the time of the disposition, we found out that there was a security district court had an option of either committing the child to the detaining, which meant committing to BOP, or essentially putting her on probation with conditions of which a condition could be one of these other facilities. Is that correct? Yes, and I'm sorry. And the BOP regulations had nothing to do with that. But even your expert agreed that she needed to be in a level one lockdown facility. Well, if I may, Your Honor, I'd like to answer that question. What happened in this case is that by the time that we got to the mitigation hearing, we were aware of that. The only options that were presented to the court were level one secured facilities because of the fact that we were aware of what BOP's regulation was. So the court was correct in that the ---- Let me just go back. If she were sent to one of these facilities, it would not be under BOP. Is that not right? That is correct. And what I'm saying, Your Honor ---- BOP doesn't require ---- unless she's sent to BOP, the BOP regulations don't govern. But your expert agreed that she had to be in a secure facility. And what I'm saying, Your Honor, is that the BOP regulation tainted our expert in that we were aware of the fact that the court was going ---- was looking at that limited set of facilities. And what my expert testified to, Your Honor, is that my child or the child in question in this case needed a protected environment. And a protected environment is not a secure environment. And that is not an institutionalized environment. And Dr. Karp testified that in light of the seriousness of things that she believed and you can look to, I believe it was ER 178 or such, where Dr. Karp testified that this child needed a protected environment, not necessarily a secure environment. And, Your Honor, I think what we need to look at in this case is that the bottom line, as Dr. Karp testified at ER 176, is that this child would be harmed by further incarceration. In fact, she testified that incarceration was detrimental to this child. And that was meaning a lock-up-type environment. But she did say on page 179 that she, given the seriousness of things, she needs to be in a locked facility. That was your expert who testified to that. And I think that's what she was referring to, 30 to 60 days, Your Honor, for a residential treatment facility. And after that, she did ‑‑ In terms of the judge's options, if he went that route, because the BLP had no contracts with any of these facilities, there had to be funding. Who was going to pay for her to be in these facilities? So what was the record on that? Your Honor, I believe the addendum to the PSR addresses some of those issues. There was a secured funding facility, and that was the Desert Visions Center. But I think what ‑‑ That's why, I'm sorry. The Desert Visions Program, and I think what we're missing is that regardless of funding, the court has an obligation to impose a sentence that is rehabilitative and cannot look to limitations on that. It must impose a sentence that meets the child's needs and is in the best interest of that child. And like juvenile, if U.S. v. Juvenile, that is 347 F. 3778, that the court must look at the program. And in this case, the Santa Fe program that was being recommended was not necessarily in this child's best interest. And if I may go ahead and reserve the rest of my time for you both. Let me ask one question. It seems to me that a judge in exercising discretion could determine that a child who had been involved in a murder needed to be in a secure facility. Is that ‑‑ that can't be an abuse of discretion, can it? Well, I believe it can if you have direct evidence in this case, as we did, that the child did not necessarily have the characteristics of recidivist. So I think in light of that evidence, in light of the evidence that was before the district court, I think it was abuse of discretion, Your Honor. Thank you very much. Counsel. Please, Court. My name is Bruce Ferg. I'm an assistant United States attorney on behalf of the government in this case. There are a lot of factual issues here which go to the district court's exercise of discretion. But I think that I need to start off by correcting former counsel. She indicated that in the exercise of the discretion, the district court here had only secure level 1 type facilities to choose from, even amongst the options which she had presented. But the PSR at page 18 indicates that at least several of these were, in fact, not secure. But that's not relevant. I mean, the question is whether there were some that were level 1 secure activities that were rejected. There were some. But this is exactly where I am contending that this is actually not an abuse of discretion or a delegation of authority, but an excellent example of the way the process ought to work. Because what the district court judge did is, through the probation officer, look not only at the options that were presented by the defense, but also the various programs that were available through the Bureau of Prisons. And what she found is that the options that were suggested by the defense, although a couple of them were secure, were limited in various ways. Most of them were very short, six to nine months. And, in fact, Dr. Karp had made a point that because of the multiplicity of problems that this young lady had, that she needed long-term care in order to deal with that multiple group of problems. And this is where it's also important to be clear about what she actually said. You keep hearing about the 60 to 90 days time period. That testimony is at page 186 of the extract of record. And the court asked Dr. Karp, I'm looking at your last page of her report about the need for a long-term drug rehabilitation program. And that's the primary focus. And so she asked the district court, Dr. Karp, what do you mean by long-term? And Dr. Karp said, at least 30 – notice that – at least 30 to 60 days inpatient, facility for drug abuse, drug and alcohol abuse, and then, let's say, she wasn't an incarcerated person, that there would be at least a halfway house possible for another six months. I feel that she needs to be in an environment where recovery is very, very important so that she would have a long-term sense of being clean and sober. And there are lots of other places where she reiterates that long-term. So these numbers that have been thrown out to you are by no means maximums, but rather minimums. At least she should have this. And it was on the presupposition that there would be continuing aftercare, if you will, after the child had gone through whatever the Bureau of Prisons had to offer. But what the parties discovered after this particular hearing was that the newly enacted supervised release provisions for juveniles would not apply. They were considered to be ex post facto. And so that's why the court was presented with basically two options, flat-out probation to go into one of these programs that didn't offer long enough treatment and programs to do the job, or the actual incarceration within a Bureau of Prisons. It wasn't so clear. I actually read the various prospectuses. And one of them, Mingus Mountain Academy, says it's a level one secure residential treatment. It typically ranges from 6 to 12 months, but it's not unusual for specific cases to remain in our care until our 18th birthday. And he doesn't mention that one at all when he's going through the options. So on the two grants that he rejected them, i.e., they weren't secure, they weren't long enough, that one doesn't seem to be right. So my question to you is, suppose he had noticed this and thought, oh, this is really a good idea, this is closer to our home, it sounds like a really good place. Could he have done it? What would he have done with it? Well, I'm expecting that as a hypothetical because I don't think that's case. I think that this really is where the district court, and it was a sheet letter. Well, he didn't mention this place, and he did say that they weren't long enough and that they weren't secure, and that's not so of this place. But if you get right down to it, I think what the case law indicates is that the ultimate disposition of a prisoner, whether juvenile or adult, is within the control of the Attorney General's office. It's an executive function. And the most that the court can do is to make a recommendation. It can, under United States v. Juvenile and perhaps under that First Circuit case about Patrick V, do some predisposition examination of the kind of facilities that are available and say, this looks like the best bet, I recommend this. But Juvenile seems to suggest, too, perhaps that if he knows that the only thing available through the Bureau of Prisons is not the least restrictive or the best rehabilitative option, that perhaps he has an obligation not to do that, not to come there at all. But then what? Suppose he had done probation. Who would have paid for this? The defense counsel indicated that there were some kinds of sources of funding, some from tribal sources and so forth, that might have been applicable. But basically what we're getting down to here is, in fact, rather than a separation of powers problem because the court delegated its authority to the Bureau of Prisons, it would be a separation of powers problem if the court was saying, okay, I'm going to mandate to this executive agency how it disposes of the inmates to which the responsibility to deal with is consigned. And that's where the Dragna case, which I cited, which is a Ninth Circuit case, and also a juvenile case called previously another Doe, made the point that it is ultimately under the statutes, including the one that we're dealing here, the ultimate disposition rests with the Bureau of Prisons acting for the Attorney General. And so it would, in fact, be a delegation problem and a separation of powers problem if the district court So if the district judge knows that the statute says that she's supposed to be in a place closest to her home, there is a place close to her home that's available. And let's hypothetically say, and it doesn't cost any more either. So he knows that the Attorney General essentially is going to do something inconsistent with the statute, i.e., send her someplace farther from her home than he needs to. But he's just supposed to ignore that and send her off anyway? Well, at that point, I don't think it would be right, for there are some suggestions that if the Attorney General's itself acts or their designee acts in a way that's abusive of its discretion under its statutory responsibilities, which this really is, it's directed to the AG, not to the court. No, it is, although juvenile doesn't seem to see that, but yes. That that might be grounds for some other kind of action. But it's not grounds for some kind of a peremptory strike saying, me as a district court, I'm going to tell you where you can send this person. I can look at that. I can examine the available options. I can say this looks like the best, and do the kind of cooperative rather than the confrontational thing that was done in this case, where they actually were negotiating and discussing what is best for this child. And the BOP said, look, we have Santa Fe. Yeah, it's a ways away, but look at all the things it's got. It's got stuff not only for her drug abuse, which was the primary thing that Karp was talking about in the 30 to 60, 90 days context, but also this multitude of mental health problems. If you read the description, it even talks about cultural programs, which I assume would address the fact that as a Native American, she has unique needs. Well, there's no reason to think that. It could have meant they had songs and dances. And that's cultural programs. Well, in Santa Fe, it seemed likely that that's what the intent was. But the bottom line is the district court was presented with a whole lot of information, which she said, I'm looking at all of this. I'm considering everything that you put in front of me. And because of the unique needs of this child for her rehabilitation, this is where I'm going to send her, because this is the only way that she will have adequate time to actually have a decent chance at rehabilitation, given all the things that she needs. So that is really what it comes down to, is she looked in a discriminating and a discretionary fashion at all the information that was presented to her by Dr. Karp, by the defense, by the PO, by the Bureau of Prisons, and said, in my discretion, she specifically used that term, this is the best possible way to deal with this child. It's in her best interest to do this. And that's why it's totally different from U.S. v. Juvenile, where that particular judge's emphasis was on deterrence and basically punishment for the young man's sexual activities, rather than on rehabilitation. It's apples and oranges. Totally different case. And, in fact, she's, this district court judge, took the extra time to hold a second hearing specifically because she was going out of her way to comply with U.S. v. Juvenile, which was then, which had just been brought to her attention. So this is an appropriate exercise of her discretion and an appropriate sentence. Thank you very much. Counsel? Mechanical recitation of factors isn't sufficient under juvenile, and that's what happened here. The district court used this girl's victimization, her history of problems, in order to set, put her in a facility that she was sure was going to be there, and that's what happened in this case. This child is going to be taken out after a three-year sentence when she's 17 years old and going to be placed back in her community. There will be no transition. She will not be eligible for any kind of halfway house as a juvenile because she will only be 17. Subsequent to that, she will be placed back in her community, and there will be no transition. So in doing this, this was not in her best interest. Let me ask you a question about that. Well, two questions. One is, on the supervised release question or the supervision after release, you could have waived that, couldn't you? If there was an X plus factor problem, you could have waived it. I suppose. So there would have been some supervision. In all, that could have happened, but it's also possible that the court wouldn't have done that. There was no plea agreement in this case. So the court was left to the responsibility of fashioning the best sentence for this child and to ensure that she was rehabilitated. And then my second question is, I had looked before and read from this Mingus Mountain place. Suppose, and it did seem to fit the basic criteria. So suppose the judge had wanted to have her go there as a condition of probation. Is there any way she could have done it? What would have been the financing for it? I think that's exactly what didn't happen, and that's why it's an abuse of discretion. The court could have enlisted both the government and the probation office to determine not only from what the probation funding could have been, but what could have been available through Title 19, which is a Medicaid program, and could have also seen what kind of tribal funds would have been available in this case for this child. That never happened. And that is the problem, because the federal juvenile system is not set up to be able to be flexible enough to meet the needs of children. If Santa Fe, we knew that those programs were available, but we don't know how long they were. We don't know if she was going to be in a 30- to 60-day program, and after that what was going to happen. We don't know that their educational program wasn't just, here, you have your GED book, and if you're lucky enough, maybe you'll get a teacher. And, in fact, that's what is happening, unfortunately, in this case. And, therefore, it's unclear. And Santa Fe didn't necessarily have those programs, and there is no guarantee to treatment just because a child is being sent to those facilities. And I think that's what Patrick V. makes clear, and that's what juvenile makes clear. And the court, in fact, in this case, didn't do exactly what it needed to do, and I would ask this court to remand and vacate the sentence. Thank you very much. Thank you, counsel. The case of United States v. Jane Jo is submitted. Thank you very much. Next case is
judges: B. Fletcher, Gibson, Berzon